# UNITED STATES of America

v.

## William Michael ADKINSON, Robert L. Collins, and Daniel D. Kistler, Defendants.

### No. 391CR03052RV.

United States District Court,
N.D. Florida,
Pensacola Division.

Feb. 14, 2003.

Dana C Matthews, Esq, Daniel Charles O'Rourke, Esq, Matthews & Hawkins PA, Destin, Robert L Collins, Esq, Robert L Collins PA, Robert L Collins, Pro se, Robert L Collins PA, Daniel A Kistler, Pro se, Houston, TX, for William Michael Adkinson, Ann Powell Minks fka Ann Powell, Robert L Collins, Daniel A Kistler, defendants.

Stephen P Preisser, Esq, Benjamin W Beard, Esq, U.S. Attorney Northern District of Florida, Pensacola, for U.S. Attorneys.

## ORDER

SCOTT O. WRIGHT, District Judge, sitting by designation.

Pending are the motions of William Adkinson, Robert Collins, and Daniel Kistler for attorneys' fees and expenses under the Hyde Amendment. (Docs. 911, 912, and 915.) A hearing was held on Wednesday, October 23, 2002, after which, the parties were directed to file supplemental briefing on various issues and to re-organize the materials related to their Hyde Amendment claims. That briefing having been filed, I am now prepared to address the defendants' claims.

## I. *FACTUAL BACKGROUND*

This case has been described as one of the largest and most complex criminal prosecutions in the history of Northwest Florida. On September 27, 1991, a grand jury returned a fifteen count indictment against fourteen defendants, including Adkinson, Collins, and Kistler. Count I of the superseding indictment alleged a conspiracy to commit an offense against the United States in violation of Title 18, United States Code, Section 371. The charged conspiracy identified five objectives: (1) to impede the Internal Revenue Service; (2) to defraud two banks; (3) to commit mail fraud; (4) to commit wire fraud; and (5) to transport fraudulent proceeds interstate. Counts II and III alleged bank fraud in violation of Title 18, United States Code, Section 1344; Counts IV, IX, and X, charged the defendants with mail fraud in violation of Title 18, United States Code, Section 1341; Counts V, VI, and VII alleged wire fraud in violation of Title 18, United States Code, Section 1343; Counts VIII, XI, and XII alleged interstate transportation of money taken by fraud in violation of Title 18, United States Code, Section 2314; and Counts XIII, XIV, and XV charged money laundering in violation of Title 18, United States Code, Section 1956.

The defendants moved to dismiss Count I on the grounds that four of the five conspiratorial objectives charged failed to state an offense under the then-existing law of the Eleventh Circuit. Under Eleventh Circuit precedent, *United States v. Hope*, 901 F.2d 1013 (11th Cir.1990) and 861 F.2d 1574 ( 11th Cir.1988), the victim in a Section 371 conspiracy seemingly had to be the United States and not a private individual or corporation. A panel of the Eleventh Circuit had expressed its doubt about the continuing validity of *Hope* in *United States v. Falcone*, 934 F.2d 1528 (11th Cir.1991), and on August 12, 1991, the Eleventh Circuit had agreed to rehear the matter *en banc*. With the *en banc* review of *Falcone* still pending, the indictment against the defendants was returned. Judge Vinson heard oral argument on the defendants' motions on December 19, 1991, and persuaded that the Eleventh Circuit should, and soon would, overrule *Hope* and thereby allow a Section 371 conspiracy to encompass the conduct charged in the indictment, denied the motions to dismiss.

This matter proceeded to trial in January of 1992, with the *en banc* rehearing of *Falcone* still before the Eleventh Circuit. The government rested on April 8, 1992, but at that time, the Eleventh Circuit still had not issued a decision on the *en banc* rehearing. Defendants moved for judgment of acquittal, which Judge Vinson granted as to the four non-governmental objects of the conspiracy charge, as the then-existing law of the Eleventh Circuit required. The remaining conspiracy charge of Count I related only to the object of impeding the IRS. On May 20, 1992, the *en banc* Eleventh Circuit did, as anticipated, overrule *Hope,* but the decision came too late to affect the defendants' judgment of acquittal on the four conspiracy objectives involving non-governmental victims. *See United States v. Falcone,* 960 F.2d 988 (11th Cir.1992). The trial lasted for five months. Ultimately, nine defendants were convicted in June 1992 on various counts, including the three defendants who have filed the pending motions.

The defendants moved for a new trial and for judgments of acquittal, both of which were denied. The defendants also moved for a new trial on the basis of prosecutorial misconduct involving pretrial publicity and the alleged false testimony of two witnesses, which was also denied. Defendants were sentenced, and they appealed their convictions. In February 1998, the Eleventh Circuit reversed the defendants' conspiracy convictions. *United States v. Adkinson,* 135 F.3d 1363, 1375 (11th Cir.1998)(*Adkinson I*). Convictions on some of the substantive charges were also reversed. On October 26, 1998, after further briefing and consideration, the Eleventh Circuit remanded the matter for additional proceedings and a possible new

trial as to certain defendants.[1] *United States v. Adkinson,* 158 F.3d 1147 (11th Cir.1998)(*Adkinson II*). Electing not to prosecute the case further, the government then moved to dismiss the superseding indictment. Judge Vinson granted the government's motion to dismiss on March 5, 1999. That effectively terminated this prosecution.

Five of the defendants moved, pursuant to the Hyde Amendment, Public Law No. 105–199, Section 617, for attorneys' fees on the grounds that the government's position was frivolous, vexatious, or in bad faith. In an order entered on July 17, 2000, Judge Vinson denied the defendants' motions. Defendants Adkinson, Collins, Kistler, and Minks appealed. The Eleventh Circuit reversed, holding that the government acted frivolously, vexatiously, and in bad faith, entitling the appellants to attorneys' fees, expenses, and costs. *United States v. Adkinson,* 247 F.3d 1289, 1293 (11th Cir.2001)(*Adkinson III*). The Eleventh Circuit remanded to this court to determine the amount of fees, expenses, and costs to which the defendants were entitled. Because the Eleventh Circuit found the record unclear as to whether Minks filed a timely Hyde Amendment application, the Eleventh Circuit also instructed this court to clarify its ruling as to Minks' application. On October 4, 2002, Judge Vinson entered an order granting the Government's motion to dismiss defendant Minks' application for attorneys' fees as untimely filed. Minks' appeal of that order is currently before the Eleventh Circuit.

On October 23, 2002, a hearing was held before me on the entitlement of Adkinson, Kistler, and Collins to attorneys' fees,

---

1. The Eleventh Circuit found there was sufficient evidence for the jury to convict Adkinson, but not Collins, on Count VII, interstate transportation of the proceeds of fraud. *Ad-* *kinson II,* 158 F.3d at 1156. The court also found the evidence sufficient against Adkins, Collins, and Kistler to retry them as to Count III, bank fraud. *Id.* at 1161.

costs and expenses. At the hearing, Michael Ramsey, Collins' lead trial attorney, and Barry Beroset, Kistler's attorney, both testified about the unusual manner in which the fees and expenses for this case were incurred. Collins also testified and explained various expenses related to his claim. Collins also offered the testimony of his accountant, Ray Williams, who had reviewed the expenses Collins submitted and gave an opinion as to the application of time-value-of-money factors to the fee award.

At the time the original indictment was returned, Collins and Kistler were both attorneys in the same firm in Houston, Texas. Both were forced to move to Pensacola for the duration of the five month trial. Collins rented a five-bedroom house where he and several of the other defendants stayed during the trial. Collins refers to the house as the "trial office" because a portion of the house was used to store the large amount of documents necessary for preparation of the defense. Collins also relocated his legal assistant, Greta Kirkland, from Houston to Pensacola to assist in the preparation of pleadings, motions and other documents related to the trial.

Collins assembled what could only be described as an "all-star" team of defense attorneys. Michael Ramsey, Collins' lead attorney, is renowned as one of the nation's foremost criminal defense attorneys specializing in complex criminal cases.[2]

Apparently, Ramsey jointly represented Collins and Minks, although Collins was fully responsible for the Ramsey's fee. Ramsey charged Collins a $375,000 flat fee for his representation, which Collins has paid in full.[3] James Jenkins, a specialist in criminal appellate law before the Eleventh Circuit who practices in Atlanta, was hired to prepare post trial motions and to argue the appeals of those motions.[4] Jenkins billed between $200 and $225 per hour for his services and billed over $59,000 in fees. Terrance Reed and Samuel Buffone were hired to argue the direct appeal of Collins' case. Reed, from Washington, D.C. and an appellate specialist in complex criminal cases, charged a flat fee of $25,000 and then billed on an hourly basis at $225 per hour, billing a total of $72,299 in fees. Buffone, an attorney in Boston and considered by many to be one of the best appellate specialists in the country, charged a flat fee of $150,000, five-sixths of which ($125,000) was paid by Collins, one-sixth of which was paid by Minks. Buffone also associated Michael Tigar, a professor from the University of Texas, for the purposes of preparing the briefs and arguing the appeal. Tigar was paid $25,000 out of Buffone's fee. A local attorney, Robert Crongeyer, was also tangentially involved in various pre-trial and post-trial matters, for which he charged $10,920. Collins has represented himself in the litigation of his Hyde Amendment claim.

2. Ramsey apparently currently represents Kenneth Lay in the criminal cases arising out of the Enron litigation.

3. Ramsey testified that his hourly rate in 1992 was $350 per hour and that he currently charges $500 per hour. Ramsey also testified that he did not expect to receive any more than the $375,000 fee he charged Collins, although, due to the time he expended on the case, he felt like he lost money on his representation of Collins.

4. Apparently, Jenkins also jointly represented Collins and Minks, with Collins paying the fee. Collins' appeal apparently took a two-pronged attack. One prong, attacking factual issues relating to alleged juror misconduct and false testimony offered at trial, was handled by Jenkins. The other prong, which attacked the legality of the conspiracy conviction, was handled by Buffone, Reed, and Tigar. The legal services for the appeals were incurred between 1993 and 1999.

Collins also hired Barry Beroset to represent Kistler. Beroset, a local criminal defense attorney, charged an initial flat fee of $50,000 plus $5,000 per week for any services rendered after the initial ten weeks. Beroset's fee agreement was jointly signed by Collins, Kislter, and their law firm, and Collins paid Beroset's fee. Because the trial lasted twenty-one weeks, Beroset was paid $105,000. He was also paid $5,000 for representing Kistler at sentencing and was apparently also paid another $10,000 by Collins, totaling $120,000. After the trial, Kistler represented himself for all of the appeals and continues to do so.

Adkinson was represented at trial by Clifford Davis, a criminal defense attorney from Tallahassee, for a flat fee of $50,000. Apparently, Adkinson has not paid Davis any of the fee out of his own pocket, but his former brother-in-law paid Davis $20,000. Adkinson still owes Davis $30,000. After the trial, Davis moved to be Adkinson's appointed attorney for the purposes of Adkinson's appeals, which Judge Vinson granted, and thus Davis' post-trial representation of Adkinson was paid for by the public. Davis argued the appeals in *Adkinson I* and *Adkinson II* on Adkinson's behalf. After the superseding indictment was dismissed, Adkinson retained Dana Matthews, an attorney from Destin, Florida, to represent him for the purposes of the Hyde Amendment claim. Matthews continues to represent Adkinson.

## II. THE HYDE AMENDMENT

### A. *The Language of the Hyde Amendment*

Enacted in an attempt to curb prosecutorial misconduct, the Hyde Amendment provides that, under certain circumstances, a criminal defendant may recover costs, expenses, and attorneys' fees incurred as a result of a bad-faith prosecution. *See* *United States v. Gilbert,* 198 F.3d 1293, 1299–1302 (11th Cir.1999) (discussing legislative history). Title 18, United States Code, Section 3006A (Statutory Note), amended effective November 26, 1997, by Public Law No. 105–119, 111 Stat. 2440, 2519, sets out in Section 617 of the Act (the "Hyde Amendment"):

During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, *a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith,* unless the Court finds that special circumstances make such an award unjust. Such *awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code....*

(emphasis added).

In *Adkinson III,* the Eleventh Circuit held that, in this case, the government acted vexatiously and in bad faith. *Adkinson III,* 247 F.3d at 1293. In addition to showing bad faith or vexatious conduct by the government, a defendant must also show (1) that the trial was in progress on or after fiscal year 1998; (2) the defendant's net worth was less than $2 million; (3) the defendant was the "prevailing party" in the criminal case; (4) the defendant did not have court-appointed counsel; and (5) the defendant's attorneys' fees and costs are reasonable. *Id.* at 1291 n. 2. The defendant bears the burden of proving all elements of the Hyde Amendment claim by a preponderance of the evidence. *Id.* at 1291. The government concedes that this case was still "pending" after the

Hyde Amendment's effective date, November 26, 1997, that the defendants meet the net worth requirements, and that the defendants were prevailing parties. The only remaining question is the amount of reasonable attorneys' fees and costs to which the defendants are entitled.

B. *The "procedures and limitations" for filing a Hyde Amendment Claim*

■ The Hyde Amendment adopts the procedures and limitations of the Equal Access to Justice Act, Title 28, United States Code, Section 2412 ("EAJA"), for the award of attorneys' fees, expenses, and costs. The parties dispute whether the attorneys' fee caps provided in Section 2412(d) apply to Hyde Amendment claims in general, and to this case in particular. I conclude that they do apply.

■ As with any matter of statutory interpretation, the starting point is the language of the statute itself. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.* The Hyde Amendment itself provides for the award of "a reasonable attorney's fee and other litigation expenses" and that such awards shall be made "pursuant to the procedures and limitations (but not the burden of

proof) provided for an award under section 2412 of title 28, United States Code" 28 U.S.C. § 3006A (statutory note).[5]

The "limitations" Congress intended to incorporate by reference to Section 2412 are less than clear. The Hyde Amendment's general cross-reference to Section 2412 creates an ambiguity in light of the bad faith or vexatious conduct required to trigger Hyde Amendment liability. Section 2412 offers two alternative theories of recovery for attorneys fees and expenses, each of which are subject to different "limitations." *See Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1331 (11th Cir.2001); *Hyatt v. Shalala*, 6 F.3d 250, 253 (4th Cir.1993). The first theory, under Section 2412(b), makes the government liable for fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. 2412(b). This exception applies the equitable exceptions to the American Rule, including the bad-faith exception, to the government. *Maritime Mgmt.*, 242 F.3d at 1331. An award of fees under Section 2412(b) is discretionary. *Id.*

The second theory for awarding fees under the EAJA is under Section 2412(d). An award under Section 2412(d) is mandatory upon showing that the prosecution was brought in bad faith. *See Maritime*

---

**5.** The "procedures" of the EAJA are fairly clear. A party filing an EAJA claim must do so within thirty days of "final judgment in the action." 28 U.S.C. § 2412(d)(1)(B). The thirty day filing requirement is jurisdictional and cannot be waived. *United States v. J.H.T., Inc.*, 872 F.2d 373, 375 (11th Cir. 1989); *Haitian Refugee Ctr. v. Meese*, 791 F.2d 1489, 1494 (11th Cir.1986). The claim must demonstrate the applicant's eligibility and include an itemized statement from any attorney or expert witness stating the actual time expended and the rate at which the fees and expenses were computed. 28 U.S.C.

§ 2412(d)(1)(B). At least one court has held that the procedures provided in Section 2412(d) apply to Hyde Amendment claims. *See United States v. Ranger Electronic Communications, Inc.*, 210 F.3d 627, 633 (6th Cir.2000)(thirty-day Hyde application filing deadline applies); *but see United States v. Holland*, 34 F.Supp.2d 346, 358 (E.D.Va.1999)(holding Hyde claimants may elect to proceed under § 2412(b) and avoid limitations under § 2412(d)), *vacated in part on other grounds by*, 48 F.Supp.2d 571 (E.D.Va.1999), *affirmed*, 214 F.3d 523 (4th Cir.2000).

*Mgmt.*, 242 F.3d at 1332. Section 2412(d) provides for the award of costs under Section 2412(a) as well as "fees and other expenses," which is defined to include reasonable costs of expert witnesses and "reasonable" attorneys' fees. 28 U.S.C. § 2412(d)(1)(A), (d)(2)(A). Awards under Section 2412(d) contain several limitations, the most important of which for this case is that the hourly fee cannot be in excess of the statutory fee cap unless the court determines an increase in the hourly rate is justified for cost of living or "special factors." [6] 28 U.S.C. § 2412(d)(2)(A)(ii). The Eleventh Circuit, in *Adkinson III*, indicated that at least one of the limitations in Section 2412(d), the $2 million net worth limitation, applied to Hyde Amendment claims.[7] *Adkinson III*, 247 F.3d at 1291 n. 2.

By enacting the Hyde Amendment, Congress provided for the award of "reasonable" attorneys' fees subject to the "procedures and limitations" in Section 2412. Both Section 2412(b) and 2412(d) provide for the award of a "reasonable" fee, the former not subject to any cap, the latter subject to the statutory cap in Section 2412(d)(2)(A). The question arises *which* "reasonable" fee did Congress intend to apply? The defendants argue that their Hyde Amendment claim is made under Section 2412(b), that a fee award is not subject to the statutory cap, and that the court should use the lodestar method for calculating a reasonable fee, including the application of a multiplier.[8] The government argues that an award of fees under the Hyde Amendment is subject to the statutory caps in Section 2412(d)(2)(A).

■ The language of the Hyde Amendment itself is ambiguous on this point. Considering the purposes of the Hyde Amendment and its legislative history, I conclude that, when providing for a "reasonable fee," Congress intended for the fee caps in Section 2412(d)(2)(A) to apply to Hyde Amendment claims. Congress incorporated the "limitations" of Section 2412, and Section 2412(b), which merely reverts to the common law standard, is no limitation at all. The language of the Hyde Amendment largely tracks the language of Section 2412(d)(1)(A), except for the bad faith standard and the burden of proof. Further, the Hyde Amendment itself is a waiver of sovereign immunity providing for the award of attorneys' fees and expenses to criminal defendants prosecuted in bad faith. Like all waivers of sovereign immunity, the Hyde Amendment must be narrowly construed and any ambiguity must be resolved in favor of the government. *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486

---

6. Section 2412(d) also contains other limitations. The costs and fees must be *incurred* by the prevailing party, 28 U.S.C. § 2412(d)(1)(A), which has been interpreted to mean that the party must have personally paid the fees, *United States v. Paisley*, 957 F.2d 1161, 1164 (4th Cir.1992). Individual applicants must have had a net worth of less than $2 million at the time the action was filed. 28 U.S.C. § 2412(d)(2)(B); *United States v. Knott*, 256 F.3d 20, 27 (1st Cir. 2001)($2 million net-worth requirement in § 2412(d)(2)(B) applies to Hyde Amendment claimants); *United States v. Peterson*, 71 F.Supp.2d 695, 700 (S.D.Tex.1999)(same).

7. In *Adkinson III*, the Eleventh Circuit also noted that recovery under the Hyde Amendment was "subject to the restrictions and procedures articulated by the language of the law and its legislative history." *Adkinson III*, 247 F.3d at 1291 n. 2.

8. Collins argues that, in my prior order directing supplemental briefing, I decided that Section 2412(b) applies and that the fee caps are inapplicable. I merely stated that I was "inclined" to award reasonable fees under Section 2412(b). However, further consideration of this issue in light of my research of the language and legislative history of the Hyde Amendment has led me to reconsider my prior initial inclination.

**1310**

(1996); *Ardestani v. INS*, 502 U.S. 129, 137, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991). This rule of construction alone would indicate the appropriateness of applying the fee caps in Section 2412(d)(2)(A).

The legislative history surrounding the enactment of the Hyde Amendment, though sparse, confirms my interpretation. *See Gilbert*, 198 F.3d at 1299–1302 (discussing legislative history). The legislative history mainly consists of the House floor debate that occurred when Representative Hyde offered his amendment. *See* 143 CONG. REC. H7790–94 (daily ed. Sept. 24, 1997). As originally offered by Representative Hyde, the Hyde Amendment was virtually identical to Section 2412(d)(1)(A), utilizing the substantial justification standard and placing the burden of proof on the government. Representative Hyde stated:

> We have a law called the Equal Access to Justice Act, which provides in a civil case if the Government sues you, and you prevail, if the Government cannot prove substantial justification in bringing the suit, you are entitled to have attorney's fees and costs reimbursed...[I]f it was an abuse of process, if it was malicious, then the victim, the defendant who has prevailed, *is entitled to attorney's fees, very modest, $125 an hour.*
>
> \* \* \* \* \* \*
>
> Now it occurred to me if that is good for a civil suit, why not for a criminal suit?...[A]s in the Equal Access to Justice Act, you should be entitled to your attorney's fees reimbursed and the costs

of litigation, *again at the same modest rate.* That, my friends, is justice.

\* \* \* \* \* \*

I am not asking for damages...but we are asking that you repair the wound, the economic wound, somewhat by awarding attorney's fees.

143 CONG. REC. H7791 (daily ed. Sept. 24, 1997)(statement of Rep. Hyde)(emphasis added).

Several representatives raised concern about the substantial justification standard and its effect on criminal prosecutions. *See, e.g.,* 143 CONG. REC. H7792 (remarks of Rep. Skaggs, stating "Were the words 'malicious' and 'abusive' in [Rep. Hyde's] amendment, and maybe those are criteria that also ought to be introduced, it would be a different matter."). The Hyde Amendment faced stiff opposition from the President and the Justice Department, who both charged that the low substantial justification standard would deter criminal prosecutions in difficult cases and would detract from prosecutorial resources. 143 CONG. REC. H7792 (remarks of Rep. Skaggs, quoting letter from the President). The bad-faith standard was added in conference committee and the burden of proof was shifted to the defendant in an effort to address the concerns raised.[9] Had the substantial justification standard introduced by Representative Hyde remained, there would be no question that the fee caps in Section 2412(d) would apply, although Hyde Amendment claims would be more commonplace. It is apparent that the fee caps were one of the limitations

9. Congress' decision not to apply the burden of proof in Section 2412 reinforces the notion that the limitations in Section 2412(d) were meant to apply. In EAJA cases, the government bears the burden of proving substantial justification under Section 2412(d). The burden shifting language of the Hyde Amendment was clearly intended to force defendants to prove bad faith prosecution. By contrast, under the bad faith exception to the American Rule, the party seeking fees already bears the burden of proving bad faith. *See United States v. Ford*, 737 F.2d 1506, 1509 (9th Cir. 1984). If Section 2412(b) applied, but not its burden of proof, the government would be forced to prove a lack of bad faith, a result clearly contrary to the Hyde Amendment's intent.

intended to apply. It is also apparent that the bad faith standard was added to elevate the burden of proof placed on a Hyde Amendment claimant and to limit the Hyde Amendment's application, not to expand the scope of the government's liability outside the Section 2412(d) fee caps under the entirely different theory of liability in Section 2412(b).[10] I thus conclude that the fee caps in Section 2412(d) apply to Hyde Amendment claims. *See United States v. Sherburne*, 249 F.3d 1121, 1129 (9th Cir.2001)(interpreting the "limitations" incorporated by the Hyde Amendment to include the § 2142(d)(2)(A) fee caps and instructing district court to apply EAJA caps, not CJA caps, on remand). To the extent that the Hyde Amendment could be construed to provide discretion to proceed under either Section 2412(b) or 2412(d), I choose to apply the standard in Section 2412(d) to this case.

C. *Which Fee Cap Applies*

█ In the Contract With America Advancement Act of 1996, Pub.L. 104–21, § 232(b)(1), 110 Stat. 847, the attorneys' fee caps in Section 2412(d)(2)(A) were increased from $75 per hour to $125 per hour, their current rate. The increase in the fee caps applies to "civil actions and adversary adjudications commenced on or after [March 29, 1996]." Pub.L. 104–21, § 233; *see also* 5 U.S.C.A. § 504 (West's Supp.2002)(historical and statutory note). The defendants' Hyde Amendment claims, though civil in nature, are a proceeding ancillary to their original criminal prosecution and are not a new civil action. This action was thus "commenced" on September 27, 1991, when the indictment was returned. Because the commencement of this action predates the increase of the fee cap to $125, the $75 per hour fee cap applies, adjusted of course for cost·of living and special factors, as discussed below.

## III. ATTORNEYS' FEES

### A. *Hourly Rate to be Applied*

The Eleventh Circuit has promulgated a two part inquiry to determine the appropriate hourly rate to apply in an EAJA award. *See Meyer v. Sullivan*, 958 F.2d 1029, 1033 (11th Cir.1992). The district court must first determine the market rate for similar services provided by lawyers of reasonably comparable skills, experience, and reputation in the community where the services were rendered. *Id.* The second step, which is needed only if the market rate is greater than the statutory cap, is to determine whether the court should adjust the hourly fee upward to take into account an increase in the cost of living or a special factor. *Id.*

### 1. *The Prevailing Market Rate*

█ Due to the length of this case, I am forced to determine market rates in the community for nearly all of the eleven years of this case. At the hearing, Barry Beroset, Kistler's attorney, testified that he charged $150 per hour in 1992 for his representation of criminal defendants in federal court and that he considered this rate to be more than reasonable. I find that Beroset was a highly qualified and capable criminal defense attorney who practices in the Pensacola area and that $150 per hour was indicative of the prevail-

---

**10.** Reading the Hyde Amendment to permit recovery under Section 2412(b) would remove the "limitations" on recovery the Hyde Amendment sought to impose by incorporating Section 2412. A Hyde claimant alleging liability, under Section 2412(b), based on the common law bad faith exception to the American Rule, would not be subject to the fee caps or any of the other limitations imposed by the EAJA. Because bad faith or vexatious conduct is a prerequisite to any Hyde Amendment claim, any substantive limitation imposed by Section 2412(b) is non-existent. Section 2412(b) is thus not a "limitation" at all.

ing market rate in 1992 for the quality of services necessary to effectively litigate a complex federal criminal conspiracy case as unique as this one. Dana Matthews, Adkinson's attorney, charged $175 per hour in 1999 to represent Adkinson in his appeal of the denial of his Hyde Amendment claim. I also find this rate was the prevailing market rate in Northwest Florida in 1999. I find that the prevailing market rate in 2002 is $225 per hour, this is between the range that Beroset and Matthews currently charge. (Doc. 992 at 80.) Additionally, due to the increased lead-counsel role Ramsey played in coordinating the attorneys and the presentation of the defense, I find that a 10% increase is warranted for the prevailing market hourly rate for his services. I find the prevailing market rates for comparable services in the Pensacola area are as follows:

| Year | Prevailing Market Rate ($/hr.) | Prevailing Market Rate for Lead Counsel ($/hr.) |
|------|------|------|
| 1992 | $150.00 | $165.00 |
| 1993 | $150.00 | $165.00 |
| 1994 | $155.00 | $170.50 |
| 1995 | $160.00 | $176.00 |
| 1996 | $165.00 | $181.50 |
| 1997 | $170.00 | $187.00 |
| 1998 | $175.00 | $192.50 |
| 1999 | $175.00 | $192.50 |
| 2000 | $185.00 | $203.50 |
| 2001 | $210.00 | $231.00 |
| 2002 | $225.00 | $247.50 |

Because these prevailing market rates are in excess of the applicable fee cap ($75), I shall next address whether the cap rate should be adjusted for cost of living and for "special factors."

2. *Cost of Living Adjustment*

The EAJA expressly provides for a cost of living adjustment. The decision to award a cost of living adjustment to the fee cap is within the discretion of the trial court, and no special showing is necessary by the parties. *Adams v. Chater,* 914 F.Supp. 1365 (E.D.La.1995); *Dairy Maid Dairy, Inc. v. United States,* 837 F.Supp. 1370 (E.D.Va.1993). However, the Eleventh Circuit has noted that the application of the cost of living adjustment is "next to automatic." *Meyer,* 958 F.2d at 1035 n. 9. The fee is adjusted for cost of living based on the time when the services were performed, not the time when the award is made. *Masonry Masters, Inc. v. Nelson,* 105 F.3d 708, 709–13 (D.C.Cir. 1997) (holding that, in light of the Supreme Court's decision in *Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), a "current" period cannot be used); *Marcus v. Shalala,* 17 F.3d 1033, 1040 (7th Cir.1994)(same); *Perales v. Casillas,* 950 F.2d 1066, 1074–77 (5th Cir. 1992)(same); *Chiu v. United States,* 948 F.2d 711, 718–22 (Fed.Cir.1991)(same).

I conclude that a cost of living adjustment is appropriate. Most courts, including the Eleventh Circuit have approved the use of the Consumer Price Index for All Urban Consumers as the appropriate index for EAJA cost of living adjustments. The EAJA was enacted in October of 1981 and originally provided for a $75 fee cap. Thus, the cost of living adjustment will be indexed from that date according to the following formula:

$$\frac{(CPI_i)(\$75)}{(CPI_{Oct.1981})}$$

$$i = 1992, 1993, 1994,\ldots,2002$$

$$CPI_{Oct.1981} = 93.4 \,[11]$$

**11.** Although the EAJA was reenacted in 1985 with the $75 fee cap, the Eleventh Circuit has held that this reenactment did not restart the clock for indexing the CPI figures and that a 1981 base year should be used. *Jean v. Nel-*

Application of that formula yields the following hourly rates adjusted for the cost of living as indexed from October 1981.

| Year (i) | CPI Annual ($CPI_i$) | Adjusted Hourly Rate $(CPI_i)(\$75)$ $\dfrac{(CPI_{Oct.1981})}{(\$/hr.)}$ |
|---|---|---|
| 1992 | 140.30 | $112.66 |
| 1993 | 144.50 | $116.03 |
| 1994 | 148.20 | $119.00 |
| 1995 | 152.40 | $122.38 |
| 1996 | 156.90 | $125.99 |
| 1997 | 160.50 | $128.88 |
| 1998 | 163.00 | $130.89 |
| 1999 | 166.60 | $133.78 |
| 2000 | 172.20 | $138.28 |
| 2001 | 177.10 | $142.21 |
| 2002 | 179.90 | $144.46 |

### 3. Application of Special Factors

In addition to a cost of living adjustment, the EAJA hourly rate may be adjusted for "special factors."

#### a. Limited Availability of Qualified Counsel

■ Section 2412(d)(2)(A) specifically lists "limited availability of qualified attorneys for the proceedings involved" as a relevant special factor. 28 U.S.C. § 2412(d)(2)(A). The Supreme Court has given this phrase a narrow construction, limiting it to some distinctive knowledge or specialized skill, such as an identifiable practice specialty or knowledge of a foreign language. *Pierce v. Underwood*, 487 U.S. 552, 572–73, 108 S.Ct. 2541, 101 L.Ed.2d 490, 509 (1988). The fact that highly skilled lawyers or lawyers with the best reputations participate is not considered a special factor. *Jean*, 863 F.2d at

774. Neither the fact that the case vindicated public rights nor the hardships experienced by counsel may be considered. *Id.* at 775–76; *Pollgreen v. Morris*, 911 F.2d 527, 537 (11th Cir.1990).

■ Collins asserts that government threats scared away potentially viable local counsel and forced him to seek counsel from outside the local area, increasing the hourly rate he paid. Collins has not proven that threats or intimidation by the government were so pervasive as to make qualified local counsel unavailable at prevailing market rates. Beroset testified that he did have conversations with persons he knew in the United States Attorney's office and that they "cautioned" him about representing defendants in the case, but he decided to represent Kistler anyway. (Beroset Testimony, Doc. 992 at 77.) In fact, Kistler and Adkinson were both represented by counsel from Northwest Florida. Beroset testified that a "limited number" of qualified attorneys were available and capable of representing defendants in this case. (Beroset Testimony, Doc. 992 at 78.) Collins has certainly made no showing that he had to go as far away as Houston, Texas, to obtain a nationally prominent attorney due to the government's conduct. Accordingly, the hourly rate will not be adjusted by a special factor for limited availability of qualified counsel.

#### b. Bad Faith & Extreme Delay in Making the Award

■ An unusual delay in litigating a case as a result of the government's bad faith, or an excessive delay regardless of the position litigated, may constitute a special factor for increasing an EAJA award. *Pollgreen*, 911 F.2d at 538. In *Pollgreen*,

*son*, 863 F.2d 759, 774 (11th Cir.1988). The CPI figures used are those extracted from the United States Department of Labor, Bureau of Labor Statistics, Internet site, *www.bls.gov*, on January 16, 2003.

the Eleventh Circuit noted that a delay that occurred because the government litigated a position that lacked substantial justification was not a permissible special factor for an EAJA award because any EAJA award, by definition, involved the government's pursuit of an unjustified position. *Id.* The same reasoning applies to Hyde Amendment claims: the extreme delay due to the prolonged litigation of this case because the government prosecuted the defendants in bad faith does not, by itself, justify the imposition of a bad faith delay special factor because every Hyde Amendment award involves a bad faith prosecution. Complex bank fraud and tax conspiracy cases such as this one take a long time to litigate. I find nothing in the proceedings of this case to merit a bad faith or excessive delay special factor adjustment. Because I find no special factor adjustment appropriate, the cost of living adjusted hourly rates above will be applied.

### B. *Reasonable Number of Hours*

Having determined the applicable hourly rate, I next determine a reasonable number of hours expended as to each defendant for the various phases of this case.

### 1. *Pre-trial*

On behalf of Collins, attorney Robert Crongeyer billed 49.33 hours regarding various pre-trial matters when Crongeyer was initially hired as local counsel in 1992. The government does not contest this amount, and I find that the number hours to be reasonable.

### 2. *Trial*

 The trial of this case in 1992 lasted twenty-one weeks, and the government estimates the parties were in court 544 hours. As discussed *supra*, Ramsey, Beroset, and Davis, who represented Collins,

Kistler, and Adkinson, respectively, all billed either a single flat fee or a flat fee with a flat weekly fee. Thus, none of the attorneys kept track of the hours they spent working on the case. Ramsey spent a significant amount of time in Houston preparing for the trial. Ramsey and Davis arrived in Pensacola a month prior to the trial in order prepare. Ramsey estimates he spent a total of 1,000 hours in preparation prior to the trial. After the trial had concluded for the day, the attorneys would spend a significant amount of time in strategy sessions, reviewing that day's testimony and preparing for the next day. Presumably, each attorney also spent some time individually preparing the individual client's case. Ramsey estimates he spent approximately 2,000 hours working on the case during the trial. The government does not dispute Ramsey's claim that he spent a total of 3,000 hours in 1992 performing his services, and I find that amount to be reasonable considering his role coordinating the defense and representing Collins. Ramsey also contracted with three attorneys, Marjorie Myers, Michael Seigel, and Larry Simpson, who performed 13, 4, and 10 hours, respectively, in 1992 conducting legal research related to preparation for the trial. Although there is little documentation supporting these claims, I find that the 27 hours for legal research is reasonable.

Davis initially estimated he spent 1,200 hours representing Adkinson at trial, and as the time goes by, his estimate keeps increasing. Davis, in an affidavit dated April 1, 1999, asserted that his time spent would "probably exceed 1500 hours." (Hrg. Oct. 23, 2002, Adkinson Ex. 1) In a subsequent affidavit, dated October 22, 2002, Davis states that had he known the trial would have lasted five months, he would have charged a minimum of $350,000.[12] I conclude that a reasonable amount to 2,333.33 hours.

---

12. At $150.00 per hour, this fee would

number of hours spent on Davis' representation in 1992, in light of his representation of one of the principal defendants and his pretrial preparation, is 1,700 hours. I also conclude that a reasonable number of hours for Barry Beroset's representation of Kistler at trial in 1992 would be 1,300 hours.

### 3. *Post–Trial Motions*

After the trial, Davis's representation of Adkinson was paid for by the public and thus none of Davis's post-trial hours are compensable under the Hyde Amendment. Kistler represented himself, and reimbursement for time spent defending oneself is not compensable, as discussed below.

Collins retained James Jenkins, a specialist in criminal appellate law before the Eleventh Circuit who practices in Atlanta, to prepare the motion for a new trial, which was filed in September of 1994, and to argue the appeal of that motion. Jenkins also assisted in the preparation for a new trial after the Eleventh Circuit determined in *Adkinson II* that the evidence was sufficient to retry the defendants, prior to the government's dismissal of the indictment. Jenkins billed 95.6 hours in 1994, 96.5 in 1995, 58.9 in 1996, 17.5 in 1997, and 22.4 in 1998. The government does not object to the number of hours billed by Jenkins, and I find they are reasonable. Crongeyer also billed 6.8 hours in 1998 and 16.66 hours in 1999 in relation to his role in the preparation for a retrial. I also find those hours to be reasonable.

■■■ Collins also seeks reimbursement for $3,000 in fees paid to Benson Wein-

traub and $1,160 in fees paid to Garland & Samuels. Collins has submitted no documentation for either of these claims. However, at the hearing, Collins explained that these two fees were incurred related to the application of the sentencing guidelines, which had just been enacted, to the case. (Tr. Hr. Oct. 23, 2002, at 124–25.) Collins' explanation of the services is satisfactory, but because he lacks documentation of the services, I will award 20 hours of time in 1996 for these two fees.

### 4. *Appeals*

■■■ Collins hired Terrance Reed, a specialist in complex criminal cases, and Samuel Buffone, one of the country's leading appellate specialists, to represent him in his appeals. Reed billed 257.2 hours in 1994 and 74 hours in 1998 in the course of his appellate representation. The government does not contest the reasonableness of the hours Reed billed, and I find that they are reasonable. Buffone charged a $150,000 flat fee for his representation of Collins and Minks in *Adkinson I* and *Adkinson II*, of which Collins was responsible for five-sixths ($125,000). Although Buffone charged a flat fee, he states that for internal accounting purposes at his law firm, he recorded his hours and that he spent a total of 265.96 hours on this case.[13] Collins is only responsible for five-sixths of Buffone's fee, and thus, he can only claim 221.63 of Buffone's hours.[14] I find the total amount of hours Buffone expended to be reasonable, but Buffone did not break down his charges by year. Initial briefs were filed in *Adkinson I* in September of 1995, Collins' reply brief was filed in May of 1996 and oral argument was held in

---

**13.** Buffone's fee translates to approximately $564 per hour.

**14.** Buffone also states that 699.25 hours of law clerk and paralegal time were allocated to the case. Those hours will be discussed

below. Additionally, Buffone associated Tigar to help prepare the briefs and to argue the case. Tigar was paid out of Buffone's fee, and therefore, Collins is not entitled to reimbursement for the hours Tigar may have spent on the case (which are undocumented).

June of 1997. Therefore, I will allocate 30% of Buffone's hours (66.49 hours) to 1995, 20% (44.33 hours) to 1996, and 20% to 1997. Supplemental briefing was filed in *Adkinson II* some time in 1997, without oral argument, and therefore an additional 30% of Buffone's hours will be allocated to 1997.

### 5. *Litigation of the Hyde Amendment Claims*

After the government dismissed the superseding indictment in 1999, the defendants filed their Hyde Amendment claims. Collins and Kistler have both represented themselves in the litigation of their Hyde Amendment claims, including the appeal of the initial order denying their claims to the Eleventh Circuit, which was the subject of *Adkinson III*. Their eligibility for reimbursement for *pro se* attorneys fees will be discussed below.

 Adkinson hired Dana Matthews of the firm Matthews & Hawkins of Destin, Florida, to represent him in the litigation of his Hyde Amendment claim. Matthews also argued *Adkinson III* before the Eleventh Circuit and continues to represent Adkinson. Matthews' bills show his firm billed 7.5 hours in 1998, 122 hours in 1999, 65.5 hours in 2000, and 14.8 hours in 2001, which I find to be reasonable. (Adkinson Ex. 3, Hrg. Oct. 23, 2002.) Matthews' firm billed a total of 107.1 hours in 2002. I find some of these hours to be excessive and am reducing them by 20% to 80.33 hours, an amount I find more reasonable.[15]

### 6. *Pro se Fees under the Hyde Amendment*

 Collins and Kistler are both attorneys and both represented themselves in the litigation of their Hyde Amendment claims. By adopting the limitations of the EAJA, the Hyde Amendment incorporated the EAJA's prohibition of an award of *pro se* attorney's fees. *See Celeste v. Sullivan*, 988 F.2d 1069, 1070 (11th Cir.1992). It makes no difference whether the defendant seeking fees for their *pro se* representation happens to be an attorney. *See Kay v. Ehrler*, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991); *Celeste, supra*, 988 F.2d at 1070. Further, Section 2412(d)(1)(A)'s requirement that fees be *incurred* prevents reimbursement for *pro se* fees. Attorneys who represent themselves have incurred no expense for fees. Collins' and Kistler's claims for fees for their own time are denied.

### 7. *Fees in Excess of the Fee Agreement*

 I have determined that Davis spent 1,700 in his representation of Adkinson at trial in 1992. At the adjusted hourly rate I have determined for 1992, $112.66, this would amount to a fee award of $191,522. However, Adkinson's fee agreement with Davis only provided for a $50,000 flat fee, of which Adkinson has only paid $20,000. Adkinson asserts that the fee agreement between the attorney and client is "just a factor" for the court to consider, and that an award of fees in excess of the fee agreement is justified in this case. Recently, in *Tire Kingdom Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d

---

15. For instance, one associate spent over an hour preparing a two-page request to participate in the October 23 hearing and another spent an hour reviewing and revising the request. (Adkinson Ex. 3, Hrg. Oct. 23, 2002.) An associate spent 23 hours preparing Adkinson's fourteen-page reply to the government's response to the supplemental brief. I find these hours to be excessive and cannot imagine that amount would be billed to a client in the exercise of sound billing judgment. The hours expended in 2002 nearly equal those in 1999 when the original Hyde Amendment claim was filed. For that reasion, I find a twenty percent reduction for the 2002 hours justified.

1332, 1337 (11th Cir.2001), the Eleventh Circuit stated that, in calculating the reasonable hourly rate, the rate should be determined based on the reasonable worth of the services rendered. *Tire Kingdom* was a Lanham Act case between private parties with a fee award pursuant to 15 U.S.C. § 1117(a). *Id.* Adkinson cites *Tire Kingdom* for the proposition that the fee agreement is only a consideration, and not a cap, on a fee award. *Tire Kingdom* was construing a Supreme Court case, *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), which held that a contingent fee contract did not place an automatic ceiling on a fee award under 42 U.S.C. § 1988 in a civil rights case. *Id.* at 93. The Court went on to state, "[T]o hold otherwise would be inconsistent with [Section 1988] and its policy and purpose....Should a fee agreement provide less than a reasonable fee...the defendant should nevertheless be required to pay the higher amount." *Id.*

■ First, the EAJA's requirement in Section 2412(d)(1)(A) that the fees awarded be *incurred* has been interpreted to mean that the defendant personally paid the fees. *United States v. Paisley*, 957 F.2d 1161, 1164 (4th Cir.1992)(EAJA claimant with right to full indemnification for fees has not incurred fees for purposes of EAJA fee award). Other courts have held that where the statute only permits for the award of fees *incurred*, the fee agreed to in the contract is the maximum awardable. *Marre v. United States*, 38 F.3d 823, 829 (5th Cir.1994)(citing cases). Both the Lanham Act and Section 1988, by contrast, award a reasonable attorney's fee without regard to whether the fees had

been actually incurred. *See id.* Because Section 2412(d) requires the fees be actually incurred to be reimbursable, the fee agreement caps an EAJA award under Section 2412(d) and thus a Hyde Amendment award.[16]

Second, the purposes of 28 U.S.C. § 1988 and the Hyde Amendment differ significantly. The purpose of § 1988 "was to make sure that competent counsel was available to civil rights plaintiffs." *Blanchard*, 489 U.S. at 93, 109 S.Ct. 939. The purpose of the Hyde Amendment is to punish the federal government for bad-faith prosecutions by forcing the government to compensate *the defendant* for attorneys' fees and expenses *incurred* as a result of the prosecution. Ensuring the availability of competent criminal defense counsel is not a purpose of the Hyde Amendment. A Hyde Amendment award comes directly from the United States treasury[17] and is thus clearly distinguishable from both the Lanham Act claim in *Tire Kingdom*, where the fee award is paid by a private party, and from the civil rights claim in *Blanchard*, where the award was paid by a local government who lacked sovereign immunity or Eleventh Amendment immunity. Awarding a Hyde Amendment claimant fees in excess of the fee agreement would amount to awarding a windfall at public expense, an intolerable result considering the rule that waivers of sovereign immunity are to be narrowly construed.[18] The Hyde Amendment's joint purposes of punishing the government and compensating the defendant can be achieved by awarding the full amount of the fee contract.

16. Although Section 2412(b) does not contain a requirement that the fees be incurred, as described above, both the language and the legislative history of the Hyde Amendment demonstrate that the limitations in Section 2412(d) apply to Hyde Amendment claims.

17. In fact, it comes directly from the prosecuting agency's budget without new appropriation.

18. The Hyde Amendment does not amount to an award of compensatory or punitive damages against the government.

It is regrettable that Mr. Davis struck such a bad bargain in agreeing to represent Adkinson for a flat fee of $50,000, in what turned out to be an extremely complicated case.[19] Based on my estimation of his hours, the $50,000 fee amounts to $29.41 per hour, a stunningly low figure but one required by Section 2412(d). Awarding Adkinson in excess of the $50,000 fee contract, however, would not do Davis any good because the fee award belongs to the client, and an attorney has no independent right to a fee award under the EAJA. *See Panola Land Buying Ass'n v. Clark*, 844 F.2d 1506, 1511 (11th Cir. 1988). All Adkinson owes Davis is the remaining $30,000, and Adkinson is not entitled to anything more than the $50,000 he incurred. Accordingly, Adkinson is awarded $50,000 for Davis' fee. For the same reasons, Collins is awarded $120,000 for Beroset's fee.[20]

## C. *Summary of Fees Awarded*

To summarize, based on the above, Kistler is awarded no attorneys' fees. Collins and Adkinson are awarded the amounts summarized in the following tables.

### Collins' Fee Award

| Year | Adjusted EAJA Fee | Reasonable Number of Hours Expended | Amount Awarded |
|------|------|------|------|
| 1992 | $112.66 | 3076.33 | $346,579.34 |
| 1993 | $116.03 | 0 | $ 0.00 |
| 1994 | $119.00 | 352.8 | $ 41,983.20 |
| 1995 | $122.38 | 162.99 | $ 19,946.72 |
| 1996 | $125.99 | 123.23 | $ 15,525.75 |
| 1997 | $128.88 | 128.32 | $ 16,537.88 |
| 1998 | $130.89 | 103.2 | $ 13,507.85 |
| 1999 | $133.78 | 16.66 | $ 2,228.77 |
| 2000 | $138.28 | 0 | $ 0.00 |
| 2001 | $142.21 | 0 | $ 0.00 |
| 2002 | $144.46 | 0 | $ 0.00 |
| | | **TOTAL Hourly:** | $456,309.51 |

In addition, Collins is awarded the entire $120,000 paid to Beroset. Accordingly, Collins is awarded $576,309.51 in attorneys' fees.

### Adkinson's Fee Award

| Year | Adjusted EAJA Fee | Reasonable Number of Hours Expended | Amount Awarded |
|------|------|------|------|
| 1992 | $112.66 | 0 | $ 0.00 |
| 1993 | $116.03 | 0 | $ 0.00 |
| 1994 | $119.00 | 0 | $ 0.00 |
| 1995 | $122.38 | 0 | $ 0.00 |
| 1996 | $125.99 | 0 | $ 0.00 |
| 1997 | $128.88 | 0 | $ 0.00 |
| 1998 | $130.89 | 7.5 | $ 981.68 |
| 1999 | $133.78 | 122 | $16,321.16 |
| 2000 | $138.28 | 65.5 | $ 9,057.34 |
| 2001 | $142.21 | 14.8 | $ 2,104.71 |

19. Davis claims he was misled by the prosecutor who told him the trial would only take two months and that he based his fee agreement on that representation. I find Davis' assertion untenable. Attorneys who draft their fee agreements solely on the representations of the estimated trial length given to them by the prosecutor do so at their own risk. A fifteen count conspiracy, bank fraud, and wire fraud indictment against fourteen defendants involving complex banking and real estate transactions should have indicated to Davis the potential complexity of this case and the possibility that the trial might last longer than planned. Ramsey negotiated a significantly higher fee for the same case and conceded at the hearing that he did not expect to be paid any more than his $375,000 fee. Beroset, like Davis, also charged a $50,000 flat fee up front, but had the presence of mind to provide for $5,000 per week if the trial lasted longer than ten weeks.

20. I have found that Beroset reasonably expended 1,300 hours defending Kistler, for which Collins paid a total of $120,000 in fees. At $112.66 per hour, 1,300 hours would amount to $146,458. Thus, Beroset's fee is capped by the amount Collins incurred, $120,000.

| 2002 | $144.46 | 80.33 | $11,604.47 |
|------|---------|-------|------------|
| | | TOTAL Hourly: | $40,069.36 |

In addition, Adkinson is awarded the $50,000 for Davis' fee. Accordingly, Adkinson is awarded $90,069.36 in attorneys' fees.

## IV. EXPENSES

### A. *Expenses Reimbursable Under the Hyde Amendment*

By incorporating the "limitations" under the EAJA, the Hyde Amendment also limits the expenses that can be awarded to a defendant to those permitted by the EAJA. Section 2412(d)(1)(a) provides that costs are awardable as defined in Section 2412(a). Section 2412(a) provides that "costs" awardable are those enumerated in Title 28, United States Code, Section 1920,[21] but "fees and expenses of attorneys" are specifically excluded under a Section 2412(a) award of costs because they are provided for elsewhere in the EAJA. 28 U.S.C. § 2412(a). Section 2412(d)(1)(A) provides for the award of "other expenses" which is defined in Section 2412(d)(2)(A) to include "reasonable expenses of expert witnesses." 28 U.S.C. § 2412(d)(1)(A)-(2)(A). Thus, there are three types of expenses reimbursable under the EAJA: (1) costs enumerated in 28 U.S.C. § 1920, (2) reasonable expenses of attorneys, and (3) reasonable expenses of expert witnesses.

An applicant for reimbursement of expenses bears the burden to produce evidence to permit the court to determine what expenses were incurred in the litigation and their purpose. *See Loranger v. Stierheim*, 10 F.3d 776, 784 (11th Cir. 1994). Because most of the events in this case, including the trial, transpired before the enactment of the Hyde Amendment, some leeway will be granted in evaluating the accuracy of the defendants' record-keeping. Expenses are allowable to the extent they are of a type routinely billed to a client, as long as they are "necessary to the preparation of the case." *Jean, supra*, 863 F.2d at 778 (citing § 2412(d)(2)(A)). Telephone charges, reasonable travel, postage, paralegal time, law clerk time, and computerized research expenses are all compensable under the EAJA. *Jean, supra*, 863 F.2d at 778; *Aston v. Sec'y of Health and Human Serv.*, 808 F.2d 9, 12 (2d Cir.1986). Out of pocket expenses may be awarded to *pro se* parties, where the expenses are of a type ordinarily billed to a client. *See S.E.C. v. Kaufman*, 835 F.Supp. 157, 159 (S.D.N.Y.1993)(awarding expenses for travel, typing services, postage, telephone, transport and storage of records, and translation to *pro se* attorney-plaintiff).

### B. *Adkinson's Claim for Expenses*

Adkinson seeks reimbursement for expenses incurred by Davis and Matthews. Davis has no documentation of his expenses, which is understandable considering the nature of his fee agreement with Adkinson and the lack of necessity for keeping such records in 1992. Davis claims $5,000 in expenses. The government does not object to that amount, and I

---

**21.** Title 28, United States Code, Section 1920 provides:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

find that amount reasonable. Adkinson also seeks reimbursement for 10.3 hours of paralegal time that was billed by Matthews during his representation. The paralegal time was billed at $60 per hour, which I find to be excessive. I conclude that $40 per hour is a reasonable hourly rate for paralegal services in the Pensacola area between 1999 and 2002. Adkinson is awarded $412 for paralegal time. Adkinson also seeks reimbursement for $5,214.89 for various copy charges, fax charges, court reporter fees, postage, express delivery, and computerized legal research fees. These expenses are all of a type routinely billed to a client and therefore reimbursable. The government does not object to these expenses, other than $114.50 in expenses which were apparently "double-billed" on the two affidavits Matthews submitted. The expenses will be reduced by that amount, and Adkinson is awarded $10,100.39 in expenses.

### C. Kistler's Claim for Expenses

■■■ Kistler seeks $8,582.99 in costs for which he submits no receipts or further documentation other than his own affidavit. The government does not contest the amount, but I find reimbursement for various expenses unwarranted. Kistler's personal expenses related to the trial when he was represented by Beroset are not reimbursable. Kistler's expenses for when he was appearing *pro se* are reimbursable if they are of a type ordinarily billed by an attorney to a client. Kistler's claim for $2,612.50 in mileage for his trips between Houston and Pensacola during the trial is denied. Kistler's claim for $1,976.00 for meals during the trial is also denied. Kistler also seeks $776.64 for lodging in Pensacola, apparently during or before the trial, and in Atlanta, for the oral argument in *Adkinson I*. One-third of this claim ($256.29) is granted for lodging it Atlanta. Kistler also seeks $643.00 for one flight from Houston to New Orleans during the

trial and one flight to Atlanta for his appeal. Half of this claim ($321.50) is granted for the flight to Atlanta. Kistler's claim for unspecified expenses of $208 paid to Beroset was verified by Beroset at the hearing and is granted. (Tr. Hrg. Oct. 23, 2002, at 90). Kistler's other expenses, court reporter and transcript fees ($357.00), copying expenses ($1,290.32), computerized legal research ($451.55), and postage ($103.00) are all granted in full. Accordingly, Kistler is awarded $2,987.66 for his expenses.

### D. Collins Claim for Expenses

Collins' claim for expenses is by far the most extensive. Collins seeks reimbursement for nearly $500,000 in expenses incurred by him personally and by his attorneys.

#### 1. Expenses of Collins' Attorneys

##### a. Crongeyer, Beroset, Jenkins and Reed

■■■ Crongeyer ($505.36), Beroset ($545.22), Jenkins ($5,394.92) and Reed ($2,656.73) all submitted expenses, which Collins has paid, that were of a type ordinarily billed to a client: copy charges, fax charges, express delivery, filing fees, telephone charges, witness fees, subpoena fees, travel expenses, etc. Thirty-eight dollars ($38) will be deducted from Jenkins' expenses to reduce the hourly rate for paralegal services he charged to $40 per hour. Two-hundred seventy-nine dollars ($279) will be deducted from Reed's expenses for an undocumented "miscellaneous" charge which has not been sufficiently explained. In all other respects, these expenses are granted and Collins is awarded $8,785.23 for these expenses.

##### b. Buffone's Expenses

■■■ Buffone states that his firm logged 699.25 hours of paralegal time in

preparing Collins' Minks' appeals. Collins is only responsible for five-sixths of the paralegal time, or 582.71 hours. These services, like Buffone's representation, occurred between 1995 and 1998, and I conclude a reasonable hourly rate for paralegal services in the Pensacola area during that time was $35 per hour. Accordingly, Collins is awarded $ 20,394.85 for paralegal services performed by Ropes & Gray. Collins also seeks reimbursement for various categories of expenses: copy charges ($2,056.85), document preparation ($2,330.30), fax charges ($515.83), filing fees ($87.50), legal research and computer-assisted legal research ($15,677.65), meals ($114.93), postage and express delivery services ($1,536.12), telephone charges ($216.83), transcript fees ($16,839.50), travel expenses ($2,180.78) and miscellaneous other undocumented expenses ($12,088.60). All of the claimed amounts are five-sixths of the total Buffone billed. Buffone's expenses appear well documented, except for the "miscellaneous" expenses, of which I will grant half. Additionally, Collins claims $1,676.67 in expenses for Tigar to attend and argue the appeal, five-sixths of which, $1,397.23, is granted. Accordingly, Collins is awarded $44,918.92 for Buffone's expenses.

### b. Ramsey's Expenses

Ramsey paid many of the expenses related to the trial directly through his trust account, to which Collins made lump-sum deposits.

### i. Ramsey's Living Expenses

 Because Ramsey was from Houston, he was forced to relocate to Pensacola for at least six months, one month of pre-trial preparation and five months of trial. I have previously found that there was no lack of qualified attorneys in Pensacola capable of handling this case. Collins has not demonstrated a need to go outside the local area, and certainly no need to seek counsel from as far away as Houston, Texas. The government is not responsible for keeping Ramsey in his accustomed lifestyle during the trial, (Doc. 992 at 47), and Collins' claims for Ramsey's rent ($6,300), furniture rental ($1,933.46), cable television ($354.67), and utilities ($776.37) are all denied in full. I will grant 40% of Mr. Ramsey's telephone bill from his condominium. Collins claims the total bill, which amounts to $1,841.44, including a Wall Street Journal 900–number Ramsey used, was all related to the preparation of his defense. There is no doubt that many of Ramsey's calls were related to the case, and telephone charges are legitimately billed to clients. However, many of these calls were also probably personal in nature or related to other cases. It is impractical to divine which calls were legitimately related to the case and which were not. Therefore, 40% ($736.58) is granted. Thirty percent of the $1,467.23 ($440.17) Collins claims for Ramsey's meals are granted because it appears Ramsey often paid for meals for witnesses and other attorneys involved in the case during their nightly strategy sessions. Many of these meal expenses were also no doubt related to Ramsey's out-of-town travel or were for the defendants and therefore not reimbursable. Collins is awarded a total of $1,176.75 for this category.

### ii. Ramsey's Travel Expenses

 Collins claims $22,830.92 in travel expenses billed by Ramsey. Much of this expense is related to Ramsey's trips between Houston and Pensacola during and prior to the trial. Some of it is also related to travel expenses for Ramsey's partner, Mr. Tyson, although it is unclear what role he played during the trial. Some of the hotel charges were apparently for witnesses who did testify or were supposed to testify at the trial. Accordingly, 20% of

the travel expenses ($4,566.18) are granted. Collins also claims a total of $2,851.36 paid by Ramsey for rental vehicles. It appears that much of this expense was for Ramsey's rental vehicles during the trial, but some was related to vehicles used to transport witnesses. Twenty-five percent ($712.84) of this expense is granted. Collins is awarded $5,279.02 for this category.

### iii. *Trial–Related Expenses*

█ Collins' claims for charts and exhibits ($15,757.31), copy charges ($8,537.41), express delivery services ($1,774.00), transcripts ($3,000.00), witness and subpoena fees ($415.00), and trial supplies ($61.39) are all granted in full. Each of these expenses are clearly of a type ordinarily billed to a client. The extreme costs for exhibits and copy charges are justified by the document-intensive nature of this case. Collins is awarded $29,545.11 for this category.

### iv. *Witness–Related Expenses*

Several defense lay witnesses had to be flown to Pensacola and housed while they were waiting to testify or were providing information to the defense. Collins claims for expenses related to Lloyd Blue ($9,505.88), Richard Everitt ($807.14), Emory Jones ($330.85) and the New World Inn ($2,086.21) are all granted in full. Costs[22] for Sheila Carr, an immunized government witness, ($6,049.99) are denied in full. (Doc. 992 at 45–46, 66.)

█ Collins also claims expenses Ramsey paid related to expert witnesses. The EAJA expressly permits reimbursement for reasonable expenses of expert witnesses.[23] 28 U.S.C. § 2412(d)(2)(A). This case was very document intensive and verification of the authenticity of documents was critical to the defense. Collins claims $6,862.59 for fees and expenses Ramsey paid to Lamar Miller, a document examiner. Miller's affidavit (doc. 999 at tab 10) states that his rates for services were $75.00 per hour for document examination and $60.00 per hour for travel time. Miller's affidavit states he billed Ramsey for a $600 retainer, 21.6 hours of examination time, 18 hours of travel time, and three days of court appearance at $600 per day.[24] I find these rates and hours to be reasonable. Ramsey's trust account ledger lists a total of $6,862.59 in payments to Miller, but Miller's affidavit states a total $6,022.59. Collins is awarded $6,022.59 for Miller's services. The government objects to the payment of Collins' claim of $6,800 in fees to David Crown and $500 to James Daniels, both document examiners, because Collins offers no supporting documentation for those claims other than Ramsey's trust account ledger. However, Ramsey's ledger verifies these payments were made, and in the interest of leniency towards Collins record-keeping, Collins is awarded the full amount for these services. A $50 retainer fee Ramsey paid to Charles Williams, a banking expert, is also granted. Accordingly, Collins is awarded $13,372.59 for expenses related to lay and expert witnesses.

### v. *Private Investigation Services*

█ Ramsey employed various private investigators before, during and after the trial. While private investigation services are not taxable as costs, *Tinch v. City of Dayton,* 199 F.Supp.2d 758, 759 (S.D.Ohio 2002), they are reimbursable un-

---

**22.** Including the costs for Ms. Carr's legal representation by Dinah Bailey arranged for by Collins.

**23.** Section 2412(d)(1)(A)(i) also caps expert witness fees at the highest rate of compensation for expert witnesses paid by the United States. The government has not suggested that any of the fees charged by Collins' experts exceed the cap.

**24.** Miller testified at the trial on June 3, 1992.

der the EAJA where they are expenses of an attorney, are of a type ordinarily billed to a client and are necessary to the preparation of a case. Ramsey employed Eddie Carmichael with Advanced Investigations of Tallahassee, Inc., to research potential jury misconduct after the trial and to surveil the husband of one of the jurors who allegedly had connections with the government. Carmichael charged a total of $2,357.75 for this service and that claim is denied in full.[25] Private investigator fees billed for serving subpoenas by Carmichael ($577.01), Charles Ford ($439.17), and Herbert Smith ($443.17) are granted in full. An investigation firm named Intertect, Inc., was hired to investigate the truth of and respond to the allegations of financial fraud and bank fraud that were to be made by an expert witness proffered by the government, Mr. Sam Churney. (Doc. 992 at 137–38.) Mr. Pankau from Intertect, was authorized by Judge Vinson, to sit in the courtroom and listen to Mr. Churney's testimony.[26] Apparently, Pankau was going to testify to contradict Churney's testimony based on his investigation. However, when Judge Vinson limited Churney's testimony, Pankau's testimony and services were no longer necessary. Ramsey paid Intertect $1,000 and that amount is granted in full.[27] Accordingly, Collins is awarded $2,459.35 for private investigation services paid by Ramsey.

### vi. Miscellaneous Expenses Paid by Ramsey

Collins seeks reimbursement for $11,130.08 in miscellaneous unspecified ex-

penses for which Ramsey was reimbursed from his trust account. Apparently, these disbursements represent cash payments from the Ramsey trust account to Ramsey and his partner Tyson for out-of-pocket expenses incurred during the trial. Collins states that these items were "reasonably necessary to Mr. Ramsey's living in Pensacola for nine months." As I stated earlier, the government is not responsible for maintaining Ramsey's lifestyle while he relocated to Pensacola for the trial. In absence of any further explanation of these expenses and how they are of a type ordinarily billed to a client and necessary to the preparation the case, these expenses are denied in full.

### 2. Collins' Expenses paid for by Himself

■ Collins seeks reimbursement for more than $196,000 in expenses he personally incurred as a result of the trial. Again, expenses are only reimbursable under the EAJA where they are of a type ordinarily billed by an attorney to a client and they are necessary to the preparation of the case. In many instances, Collins paid for items that would normally have been paid for by his attorneys and billed to him or to the other defendants. Where these items meet the EAJA standard, they are reimbursable.

### a. Kistler's Salary

■ Collins seeks reimbursement for $23,900.58 which he claims is the salary paid to Kistler by the law firm of Collins &

---

25. The defendants were specifically forbidden from directly contacting the jurors by Judge Vinson (doc. 554). Rather than directly contact jurors, the defendants hired Carmichael to indirectly investigate jurors and their family members. While the defendants may not have violated the letter of Judge Vinson's order, they violated its spirit and are not enti-

tled to reimbursement for investigative services related to the jury investigation.

26. Apparently, Pankau spent several weeks in Pensacola reviewing documents and listening to testimony.

27. Collins also paid Intertect $20,000 which will be discussed below.

Kislter during the trial. There is no legal basis for reimbursement of a co-defendant's salary regardless of the role he played in preparing the defense.[28] This claim is denied in full.

### b. *Living Expenses*

█ Collins seeks reimbursement for his living expenses at what he calls "the trial office," a five bedroom house he rented during the trial, which may have been located on Pensacola Beach. Apparently, Collins and several of the defendants lived together in this house during the trial and documents related to the trial were also stored there. The Hyde Amendment was not intended to provide relocation compensation for criminal defendants forced to move away from home during their trial. A party's living expenses during the trial are not the type of expense ordinarily billed by an attorney to a client and thus Collins' claims for rent ($5,177.00), furniture rental ($4,901.23), utilities ($2,819.60), and telephone charges ($3489.66) are denied in full.

### c. *Travel Expenses*

█ Collins seeks reimbursement for $29,720.92 in travel expenses for meals, hotels, parking, and other travel-related expenses. Collins states that "some" of the expenses were for transporting and housing witnesses and expert witnesses. The rest of these expenses were no doubt personal travel expenses, which are not reimbursable. Twenty-five percent of the travel expenses ($7,430.23) are granted. Collins' claim of $1,052 for rental vehicles and $812 for parking and airfare are denied in full. Accordingly, Collins is awarded $7,430.23 for this category.

### d. *Trial-related Expenses*

Collins claim for copy charges ($5,917.15), expert fees ($200.00), fax charges ($529), express delivery services ($1,352.79), legal research ($932.10), postage and delivery services ($322.27), witness and subpoena fees ($435.00), and witness-related expenses ($1,061.40) are all granted in full. These are all expenses of a type ordinarily billed by an attorney to a client and necessary to the preparation of the defense. Accordingly, Collins is awarded $10,749.71 for this category.

### e. *Services of Legal Assistant*

█ Collins seeks $24,364.18 for the salary of his legal assistant, Greta Kirkland, and for Mark Raines, both of whom assisted in the preparation of the case. Ms. Kirkland was employed by Collins' firm prior to the trial, and it appears she mainly performed secretarial services. (Doc. 992 at 17–18, 29, 98.) Mr. Raines was an intern with Collins' law firm who also worked on the case. (Doc. 992 at 131–32.) Normally, secretarial services would be included in an attorney's overhead and would not be separately compensable. *See Jean,* 863 F.2d at 778. However, Ms. Kirkland made significant sacrifices by moving to Pensacola for the entire trial and assisting a number of the attorneys, including Ramsey and others, by helping them prepare documents, pleadings and motions, often working long hours and weekends.[29] Ms. Kirkland's services were invaluable to the preparation of Collins' defense, and in the unusual circumstances of this case, I find Ms. Kirkland's services, travel and living expenses are compensable. I find Mr. Raines' services are not

---

**28.** Collins' claim for Kistler's salary is no more than an disguised effort to obtain compensation for *pro se* attorneys' fees, which, as discussed above, is not allowable under the EAJA.

**29.** Ms. Kirkland stayed in a hotel near the courthouse which also functioned as her office.

compensable. It is unclear from Collins' claim what portion of the salaries claimed represents that of Ms. Kirkland, and accordingly, sixty percent of the claimed $24,364.18 ($14,780.51) is granted. Ms. Kirkland's living expenses, $3,091.76 and other expenses, $657.51, are also granted. Accordingly, Collins is awarded $18,529.78 for this category.

### f. *Private Investigation Services*

 Normally, private investigators would be hired by the attorney and the services would be billed to the client as an expense. In the unusual circumstances of this case, Collins paid for a substantial amount of private investigation services himself. Collins claims $6,042.87 in services performed by Information and Research System which provided voir dire and demographic information on the jury pool. I do not find this service was necessary to the preparation of the case and therefore it is denied. Collins claims $20,000 paid to Intertect for the services of Mr. Pankau described above. Collins provide no documentation as to the rate Mr. Pankau charged for his services, therefore, I will grant 60% of this claim ($12,000). Collins also claims $9,615.46 in services performed by Investigative Reporting & Consulting for research and investigative services, locating and interviewing witnesses, serving subpoenas, and other document research. This claim, though lacking documentation, is granted in full. Collins also claims $61,302.80 in services and expenses of Gary Bonds, a private investigator Collins hired who, according to his affidavit, spent more than 1,500 hours interviewing witnesses, collecting evidence, organizing documents and working with the attorneys in this case. (Doc. 999 at

tab 62.) Bonds charged $35 per hour for his services, which I find to be a reasonable rate. Bonds also incurred $8,802.80 in expenses of which I will award half ($4,401.40). Accordingly, Collins is awarded $78,516.86 in private investigative services.

### g. *Miscellaneous Expenses*

Collins claims $16,346.69 in miscellaneous expenses which are denied in full.

### h. *Preparation of Collins Hyde Amendment Claim*

 Obviously, the preparation of Collins' Hyde Amendment claim and the litigation of that claim was a voluminous task. Collins has made a significant effort to reconstruct the documentation for the various expenses listed above. In addition to the fees and expenses associated with litigating the case, prevailing Hyde·Amendment claimants are also permitted reimbursement for fees and expenses incurred in preparing their claim and litigating the merits of the claim. However, an entitlement to fees and expenses is not an open invitation to gouge the government. Collins' claim of $320 for the eight hours spent by Bonds preparing his two page affidavit is excessive; $40 will be awarded. Collins' claim for $705.80 for Matthews & Hawkins' filing of his notice of appeal is also excessive and is denied in full. Likewise, of Collins' claim of $8,400.00 for 28 hours of his accountant Ray Smith to review documents and participate in the October 23, 2002, hearing 10% is granted ($840.00). Mr. Smith's testimony was not necessary at the hearing and provided little useful information.[30] Collins claim of

---

**30.** The court does not need instructions from an accountant on how to calculate interest or the time value of money. Likewise, the court does not need (incorrect) advice from Mr. Smith on interpreting its own decisions on the award of attorneys' fee multipliers. I also find Mr. Smith's hourly rate of $300 per hour to sort through the boxes of Collins' documentation to be unreasonable.

86.75 hours of paralegal services is reasonable based on the number of documents that had to be gathered and prepared to submit and litigate his Hyde Amendment claim. At $40 per hour, $3,470 in paralegal services are awarded. Collins' unsupported claim of $4,750 for Ramsey's for appearance at the hearing and travel will be reduced to $2,500. Ramsey's testimony was informative and necessary for the conduct of the hearing, but the fee charged for his appearance is excessive, probably because it reflects Ramsey's current hourly rate. Collins' claim of $300 paid to Lamar Miller to prepare his affidavit will be reduced to $80. I find Mr. Jenkins' fee of $350 to prepare his affidavit to be reasonable based on the records he had to prepare and submit with his affidavit. I find Collins' claims for Beroset's affidavit ($37.55), computerized legal research ($913.05), express delivery services ($380.50), printing and copy charges ($1,409.23), postage ($88.32), and travel ($1,728.89) all to be reasonable and they are awarded in full. Accordingly, Collins is awarded $11,877.99 for expenses incurred in litigating his Hyde Amendment claim.

## III. CONCLUSION

For the reasons stated above, the defendants' motions for award of attorneys' fees, costs and expenses pursuant to the Hyde Amendment (docs. 911, 912, and 915) are GRANTED. Judgment is granted in favor of William Adkinson in the amount of $100,169.75; in favor of Daniel Kistler in the amount of $2,987.66; and in favor of Robert Collins in the amount of $808,951.05.